UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GABRIELLE WARREN by her Next Friend DARLENE WARREN and DARLENE WARREN, as Next Friend and Special Administrator of JEANNETTA MCDOWELL, deceased,<br><br>Plaintiffs,<br><br>v.<br><br>SHERIFF OF COOK COUNTY THOMAS DART, in his official and individual capacity, et al.,<br><br>Defendants. | No. 09 CV 3512<br><br><br><br><br><br>Magistrate Judge Young B. Kim<br><br><br><br><br>October 30, 2013 |

**MEMORANDUM OPINION and ORDER**

Plaintiffs allege in this action that Defendants' deliberate indifference to the medical needs of Jeannetta McDowell resulted in her death while she was a pretrial detainee at the Cook County Jail. Before the court is Plaintiffs' Amended Motion to Compel Production of a 30(b)(6) witness to testify about, among other topics, any "countermeasures, reviews, responses, and/or investigations" undertaken by Cermak Health Services ("Cermak") as a result of McDowell's death. Defendant Cook County ("County") argues that testimony about Cermak's investigation is privileged and not subject to disclosure pursuant to the Illinois Medical Studies Act ("IMSA"), 735 ILCS § 8/8-2101. For the following reasons, the motion is denied as to this topic:

## Background

McDowell was arrested for retail theft on June 6, 2008. (R. 83, Ans. to Second Amend. Compl. at ¶ 14.) She was detained by the Cook County Sheriff's Office and housed in Division Three of the Cook County Jail. (Id. at ¶¶ 15, 18.) Early on June 9, 2008, she was found dead in her cell. (Id. at ¶ 19.) Plaintiffs allege that McDowell died of bronchial asthma, a condition that would have been treatable had Defendants given her access to medical treatment. (R. 60, Second Amend. Compl. at ¶ 24.)

Gabrielle Warren (McDowell's daughter), by her next friend Darlene Warren, and Darlene Warren, as Next Friend and Special Administrator of McDowell, filed this lawsuit against Cook County, Sheriff Thomas Dart, several correctional officers and supervisory correctional officers who were employed at the Cook County Jail during the relevant time period, and several Cermak nurses. Plaintiffs bring this suit pursuant to the Civil Rights Act, 42 U.S.C. § 1983, on the basis that Defendants were deliberately indifferent to McDowell's medical needs, that their indifference was the result of customs, policies, and practices of disregarding the serious medical needs of detainees, and that McDowell died as a result. Plaintiffs further allege violations of Illinois law for wrongful death, intentional infliction of emotional distress, negligence, respondeat superior, indemnification, and a claim for survival.

Plaintiffs served a notice on Cermak to produce a Rule 30(b)(6) deponent to testify about a number of topics, including, as relevant here, Topic 13:

2

>Descriptions of all countermeasures, reviews, responses, and/or investigations Cermak undertook as a result of the death of Ms. McDowell. As to each such undertaking, provide the following information:
>
>a. Identity of each agent or representative of Cermak who participated in the investigation;
>
>b. Date, location, and description of the investigation;
>
>c. Identity of all participants in the undertaking and describe their respective roles in the undertaking;
>
>d. All information Cermak learned in the investigation;
>
>e. Description of any documents involved in the undertaking or reviewed as part of the investigation; and
>
>f. All remedies, responses, discipline, or actions taken as a result of the undertaking.

Cermak conducted an investigation of McDowell's death for the purpose of creating a Mortality Review Report for Patient Safety and Quality Improvement ("Report"). The County argues that this investigation and Report, while responsive to Topic 13, are protected from disclosure by the peer review privilege codified under IMSA. Plaintiffs seek to compel disclosure of the Report on the ground that the peer review privilege does not apply in this case.

**Analysis**

The Federal Rules of Civil Procedure authorize "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense . . . ." Fed. R. Civ. P. 26(b)(1). Claims of privilege in federal court are governed by Federal Rule of Evidence 501, which provides that "[t]he common law—as interpreted by United States courts in the light of reason and experience—governs a claim of

3

privilege" unless provided otherwise by exceptions not applicable here. Fed. R. Evid. 501. This rule further provides that "in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision." *Id.*

Plaintiffs assert six counts under state law but their principal count arises under 42 U.S.C. § 1983. Plaintiffs argue that IMSA is inapplicable in a federal deliberate indifference case. Because state law does not supply the rule of decision for the principal count, this court is not obligated to apply Illinois law to determine whether testimony about the investigation and the Report is privileged. *See Memorial Hosp. for McHenry Co. v. Shadur*, 664 F.2d 1058, 1061 (7th Cir. 1981) (finding that in a case arising under the Sherman Act, 15 U.S.C. § 1, and also alleging a pendent state law claim, "the district court was not required to apply state law in determining whether the material sought" is privileged). But just because a privilege recognized by state law is not binding on this court does not mean that this court must ignore it or that it is not relevant. Instead, the court should "consider the law of the state in which the case arises in determining whether a privilege should be recognized as a matter of federal law." *Id.* at 1061. And a "strong policy of comity between state and federal sovereignties impels federal courts to recognize state privileges where this can be accomplished at no substantial cost to federal substantive and procedural policy." *Id.*

Before addressing the issue of whether comity weighs in favor of applying Illinois's medical peer review privilege, the court must first determine whether

4

Illinois law would protect the information Plaintiffs seek in this case. IMSA provides in relevant part that:

> All information, interviews, reports, statements, memoranda . . . of a health care practitioner's professional competence, or other data of . . . committees . . . used in the course of internal quality control or of medical study for the purpose of reducing morbidity or mortality, or for improving patient care . . . shall be privileged, strictly confidential . . . .

735 ILCS 5/8-2101. IMSA further provides that "[s]uch information, records, reports, statements, notes, memoranda, or other data, shall not be admissible as evidence, nor discoverable in any action of any kind in any court." 735 ILCS 5/8-2012. Illinois courts refer to this privilege as the "peer review privilege." *See Roach v. Springfield Clinic*, 623 N.E. 2d 246, 251 (Ill. 1993). In *Roach,* the Illinois Supreme Court found that the purpose of the Act "is to ensure that members of the medical profession will effectively engage in self-evaluation of their peers in the interest of advancing the quality of health care." *Id.* The privilege is "premised on the theory that, in the absence of such confidentiality, doctors will be reluctant to sit on peer-review committees." *Marsh v. Lake Forest Hosp.*, 166 Ill.App.3d 70, 75 (2nd Dist. 1988). To advance this purpose without "effectively insulat[ing] from disclosure virtually all adverse facts known to [a hospital's] medical staff," the privilege attaches only to investigations "involved in the peer-review process." *Roach*, 623 N.E.2d at 250-51. The mechanisms and thought processes of the peer review committee are protected, as are "any recommendations made and internal conclusions reached" by the peer-review committee. *See Anderson v. Rush-Copley Med. Ctr., Inc.*, 385 Ill.App.3d 167, 177-78, 185 (2nd Dist. 2008). But investigations

5

concerning risk of litigation, *see Webb v. Mount Sinai Hosp. and Med. Ctr. of Chicago, Inc.,* 347 Ill.App.3d 817, 827 (1st Dist. 2004), and conversations initiated for reasons apart from the peer-review process, *see Grandi v. Shah,* 261 Ill.App.3d 551, 556-57 (1st Dist. 1994), do not fall within the statutory protection because they do not serve the purpose of promoting effective self-evaluation within the medical profession in an effort to improve patient care.

The County bears the burden of establishing the applicability of this statutory privilege. *Id.* To that end, the County submitted the affidavit of Dr. Andrew Ting, who investigated McDowell's death and prepared the Report. (R. 193-1.) Dr. Ting's affidavit supports the conclusion that the Report was created for Cermak's Patient Safety and Quality Improvement Committee ("Committee"), though it does not specifically say so. First, Dr. Ting testified that he is a member of the Committee. (Id. at ¶ 2.) Second, he stated that the Report was shared with the Committee "and no one else." (See id at ¶ 6.) Third, he stated that this Report is in the "standard committee form," with "committee" referring to the Patient Safety and Quality Improvement Committee. (Id. at ¶¶ 2, 3.) Fourth, Dr. Ting testified that he prepared the Report "as part of a self-evaluative and self-critical analysis of a Sentinel event, in order to identify potential improvements in the quality of health care." (Id. at ¶ 2.)

Based on an *in camera* review of the Report, this court finds that it was a product of a peer-review process to benefit patient care and to reduce the rates of death at the jail. Aside from the caveat printed on each page that the "report has

been prepared as part of a self-evaluative and self-critical analysis of a Sentinel event, in order to identify potential improvements in the quality of health care," the content of the report is medical in nature. The Report is consistent with Dr. Ting's testimony that he prepares Mortality Review Reports for Patient Safety and Quality Improvement by reviewing medical records, intake documents, computer records, lab tests, pharmacy records, the autopsy report, and by interviewing relevant security/Sheriff's officers or nurses. (See id. at ¶ 4.) It includes recommendations for the improvement of patient care. The Report's date and format suggest that it was presented or generated at a meeting of the Committee within a month of McDowell's death, and it indicates that at least five of the seven people in attendance were medical providers. The Report does not discuss liability, litigation risk, or other business concerns, but is focused singularly on medical care and the improvement thereof. For these reasons, Dr. Ting's investigation and his Report are subject to the protection afforded by IMSA.

    This court finds Plaintiffs' arguments to the contrary unavailing but will address them for the sake of completeness. First, Plaintiffs contest Dr. Ting's averment that only the members of the Committee viewed the report. They point to the deposition testimony of Dr. Jesus Estrada, the Interim Chief Operations Officer, who testified that he reviewed the Report before his Rule 30(b)(6) deposition to refresh his recollection. (R. 196-2 at Ex. 5, Estrada Dep. at 81:13-82:2.) This court agrees that there is some tension between Dr. Ting's and Dr. Estrada's testimony. However, because Illinois courts have concluded that a "document that 'was

7

initiated, created, prepared, or generated by a peer-review committee' is privileged under the Act, 'even though it was later disseminated outside the peer-review process,'" *see Webb,* 347 Ill.App.3d at 825 (quoting *Chicago Trust Co. v. Cook County Hosp.,* 298 Ill.App.3d 396, 406 (1st Dist. 1998)), this court cannot hold that Dr. Estrada's review of the Report renders the peer-review privilege inapplicable here.

Second, Plaintiffs argue that if Dr. Ting consulted non-medical, custodial staff during his investigation, any information gathered from those conversations would be non-medical and therefore not privileged. Indeed, Dr. Ting stated that it was his practice to "speak to the security/sheriff's officers and the nurses on duty for any additional information which may be relevant to the cause of death." (R. 193-1 at ¶ 4.) The Report confirms that he followed this practice in McDowell's case. Plaintiffs cite *Jenkins v. DeKalb County, Georgia*, 242 F.R.D. 652, 660-61 (N.D. Ga. 2007), for the proposition that a "review of a deceased inmate is not the straightforward evaluation of medical care that occurs in a medical context. The generation of post-death reports . . . may include details such as . . . whether there was a reason for non-medical officials to have monitored a situation more closely." While Plaintiffs' argument raises valid concerns, the district court in *Jenkins* assumed that Georgia privilege law would protect a similar document from disclosure, and thus the issues raised in *Jenkins* are not relevant to the question of whether the Illinois peer review privilege is applicable to the Report. Also it is wholly reasonable for Dr. Ting to have considered the environment in which medical

8

services are rendered because the purpose of the investigation was to improve medical care to inmates.

Having decided that the Report falls within the protective umbrella of IMSA, this court now turns to the question of whether this privilege should be recognized in this case arising under 42 U.S.C. § 1983 with pendent state law claims. In *Memorial Hospital,* the Seventh Circuit provided two principles that guide this court's analysis of whether a federal court should respect the Illinois peer review privilege. "First, because evidentiary privileges operate to exclude relevant evidence and thereby block the judicial fact-finding function, they are not favored and, where recognized, must be narrowly construed." *Memorial Hosp.*, 664 F.2d at 1061. Second, a court should "take into account the particular factual circumstances of the case" and should "weigh the need for truth against the importance of the relationship or policy sought to be furthered by the privilege, and the likelihood that recognition of the privilege will in fact protect that relationship in the factual setting of the case." *Id.* at 1061-62.

Plaintiffs argue that this balancing test tips in their favor because the Report may enable them to prove that Defendants' policies and procedures, or *de facto* policies and procedures, condoned constitutional violations. In their view, the investigation and the recommendations in the Report will show whether Defendants were deliberately indifferent to deaths at the jail and whether any jail or Cermak employees were aware of problems relating to McDowell's medical treatment or that of others with asthma and/or myocarditis. As mentioned above,

9

Plaintiffs find support in *Jenkins*, another case brought by relatives of a detainee who died in the custody of a county jail: "The generation of post-death reports . . . may include details such as . . . whether there was a reason for non-medical officials to have monitored a situation more closely. The report may . . . raise an inference of jail customs or policies." *Jenkins*, 242 F.R.D. at 660. Similarly, in *Estate of Belbachir v. County of McHenry*, No. 06 C 01392, 2007 WL 2128341 at *6-*7 (N.D. Ill. July 25, 2007), another case arising from the death of a detainee, the court noted that "unofficial, defacto [*sic*] practices and customs within the jail are much more difficult to expose," and concluded that "evidence of unconstitutional policies and customs may not exist outside of the confines of a post-death consultation of jail personnel."

Defendants counter that Plaintiffs have access to every source of information that Dr. Ting used in generating the Report, and thus have no specific need to inquire about the investigation or the Report itself. For example, Plaintiffs have deposed the medical examiner, all of the individual nurses sued, and the physician assistant who treated McDowell in the emergency room on the first of her three nights at the jail. Plaintiffs have had access to all of the medical records and Sheriff's records pertaining to the case, including the autopsy report. Plaintiffs also have the 12-page investigative report written by the Cook County Sheriff's Investigator Kenneth Raher, which contains notes from interviews with Sheriff's employees and inmate witnesses that were on McDowell's tier.

Turning to the policy considerations behind the peer review privilege, Defendants argue that disclosure of the Report would frustrate Illinois's efforts to encourage frank discussions to improve the quality of medical care. "By providing that information obtained by [peer review] committees would be kept confidential, the Illinois legislature intended to encourage individuals with relevant information to speak freely." *Memorial Hosp.,* 664 F.2d at 1062 (citing *Matviuw v. Johnson*, 70 Ill.App.3d 481, 486 (1st Dist. 1979)). The policy considerations are thus most compelling when a plaintiff's claim is based on medical malpractice, because the purpose of the Act is "to ensure that members of the medical profession will effectively engage in self-evaluation of their peers in the interest of advancing the quality of health care." *See Roach,* 623 N.E. 2d at 251. The policy considerations are less compelling when a plaintiff's claim centers not on the quality of medical care but on the mechanisms of the committee process itself. *See Memorial Hosp.*, 664 F.2d at 1063 (granting motion to compel in an antitrust suit alleging that the defendants used the committee process to wrongfully deny a doctor staff privileges).

This court concludes that given the particular factual circumstances of this case and an *in camera* review of the Report, the balance of Plaintiffs' need and Cermak's interest in the peer review process tips in favor of protecting the Report from disclosure. Plaintiffs have not disputed the County's assertion that they have had access to the entire source materials relied on by Dr. Ting in the generation of his report. Nor have they disputed the County's assertion regarding Investigator Raher's report, which reflects notes from post-death interviews with Sheriff's

employees. In this court's view, Plaintiffs have failed to articulate why Dr. Ting's assessment of the evidence is necessary to the truth-seeking process. *Compare Estate of Belbachir*, 2007 WL 2128341 at *6-*7 ("[E]vidence of unconstitutional policies and customs may not exist outside of the confines of a post-death consultation of jail personnel."). Here, Plaintiffs have not articulated how Cermak's peer review procedure and Report would provide a window into the causes of McDowell's tragic death that is otherwise unavailable through the evidence already produced. This court is therefore reticent to subvert the important policy goals of the Illinois peer review privilege in this case.

## Conclusion

For the foregoing reasons, Plaintiffs' Amended Motion to Compel Production of a 30(b)(6) witness to cover Topic 13 is denied.

**ENTER:**

_____
Young B. Kim
United States Magistrate Judge